23-7006. Mr. Kaepern, when you're ready. I'm Stephen Kaepern. I represent the plaintiff in this case, Brittany Brown. Brittany Brown at the time of the events at issue was a pretrial detainee in the Pontotoc County Jail. She was awaiting trial and she was raped, undisputedly, on two separate occasions, two consecutive Sundays by the defendant, Roger Flowers. Flowers was on the job as a jailer. The fact of the rape was admitted by him and the rapes, plural, were admitted by him in a video that you have taken by the sheriff immediately after Miss Brown requested a rape kit and requested to be taken to the hospital. So, again, the facts of the rapes are not in question. Proceeding to the rapes, for about four months proceeding to that, Mr. Flowers was operating out of the control tower at the jail and was using the camera system at the jail for what I dubbed a peep show. He was asking women to disrobe, not asking but telling them to disrobe. He was watching them in the showers, asking them to get out of the showers and show them various parts of their bodies. All of that is undisputed. The events led to a plea bargain by Mr. Flowers, two felony counts of rape. I believe it was pled down from first degree to second degree. Were there any recordings of that misconduct? I beg your pardon? Were there any recordings of that misconduct? The flashing? His demanding that they expose themselves and their doing that. It was destroyed. It was requested. We have video going back that far and we have requested that video, but certain videos were preserved and certain were not. That is a set. It was definitely recorded at one time. There's no dispute that the peep show for months was recorded. Were his comments recorded also or just what the women did? I don't know if the recording system picks up audio or not, but we do know that whatever existed at one time, and obviously it existed. He's watching this through the closed circuit television system. It existed, but it no longer was preserved after the case. Ms. Brown, she won a judgment at trial, right? She did. Compensatory damages. Is what you're reciting relevant to the three claims that were? It is, Your Honor. Could you tie it together, please? Sure. So the reason why it's important here is because the trial judge addressed the rapes as if they were just some kind of a technical rape. Like they were because he entered into a plea bargain pursuant to a statute that apparently applies to police officers or law enforcement officers. It wasn't a serious rape. But the evidence that was shown in the motion for summary judgment process that is relevant to the issue of punitive damages, and that's the issue remaining against Roger Flowers, showed that this was a forceful rape. It was not a consensual event. It was not what the trial judge described as a quid pro quo. In fact, Roger Flowers himself said there never was a quid pro quo. The undisputed evidence in the trial court was that there was no quid pro quo. So when Judge White describes this… I thought that she mentioned cigarettes. She mentions getting cigarettes after the fact. There were cigarettes brought down after the rape to get the girls not to speak out on the matter. And just so the facts are more clarified, he directs her by the intercom how to get to the control tower. Is that right? He directs her how to leave the pod and every step of the way how to get to the control tower, and he controls the locks to unlock them and lock them behind her as she makes her move. And then she says she got cigarettes and shared cigarettes. After the fact, but not as part of a quid pro quo. She was very clear. And then the following Sunday, seven days later, same thing happened. He opened the locks for her and she went to the control tower. That's correct. And we have the video of her leaving the pod, but we don't have the videos of what happened inside of the pods. So the rapes happened and under a straightforward application of Guyron. I hope I'm pronouncing that case correctly. But the Guyron court said, following Supreme Court precedent, that if there's not a legitimate penological purpose for the use of force, it is presumptively malicious. And that's what we have here. There's an admission that there was no legitimate penological purpose for the use of force. It wasn't even alleged that there was a legitimate penological purpose. In fact, Guyron says there is never can never be a legitimate penological purpose for sexual abuse of an inmate. So we have a presumption of malice. We have evidence supporting a forceful rape, not some technical rape, as Judge White described it, but a forceful rape where she was crying. And because of her tears and because of the effect her tears were having on him, he forced her to turn around to complete the sexual act from behind. So we have, under a straightforward application of Guyron, a presumption of malice. And that's more than enough to get this case to the jury on the issue of punitive damages. The issue of deliberate indifference, really the sheriff's deliberate, I call it deliberate indifference. It's really a supervisor liability claim, but there's also an official capacity claim. And they're really condensed into one analysis here since he was, in fact, the highest policymaker for the jail. That's an undisputed fact. So I'm going to address the supervisor liability claim first, but it's really, again, the same analysis. The only issue that is left open by the judge's order in the trial court is whether or not the sheriff was deliberately indifferent in this particular case. The trial court found the first two elements to have been satisfied by evidence. In fact, he says that the personal involvement was met because the sheriff failed to create and enforce policies to protect inmates from rape. So clearly there's a policy problem. The judge found that the sheriff was personally involved. And then, of course, critical to that analysis is the fact the sheriff admitted he was aware of prior instances of rape in the very recent past in his jail. And he had made no changes to anything, whether it be cameras, policies, or otherwise, after those past instances, after Brittany Brown's instance. And, in fact, he's bragged almost in his brief to this court that he hasn't made any changes since. He doesn't have to make changes. I thought the record showed that for the previous incident, the guard had been fired and they added additional cameras to the facility. I'm sure that the guard was fired. I don't believe – I'm talking about the policy within the jail and the training within the jail. I don't know that additional cameras were ordered. I recall that set of facts from the Tafoya case, and I thought – and my recollection is that our case does not reflect cameras being added. In fact, I'm fairly confident that the sheriff – And flowers came on board after the previous incident, correct? That would be correct. Flowers came on board just four months before the rapes, roughly four months before the rapes. So in order to prove that the one element that's left for the deliberate indifference case, we need to show that there was a known risk and disregard for the known risk. We know there's a known risk because the sheriff admitted it. He admitted he knew he had past instances of rape in the jail. He knew that he had a duty to supervise. That's why he had the cameras and the ability to review them remotely, even though he didn't review them. He had the duty to train employees. He acknowledged that. He had the duty to make sure he had good personnel in place, and that specifically means not hiring felons, which Roger Flowers was. Doesn't it matter what type of felony it was? No, not if his rules are that you don't hire criminals, because I think the rule is in place to make sure that you don't have someone willing to break the law when you're giving them – The sheriff set the rule in place that there should be no felons, and then he broke the rule. He hired a person that he knew was a multiple felon and had a history of violence towards women, including one permanent protective order. There's not a dispute of fact over that? I don't believe Flowers – I thought the sheriff said he didn't know that. It was Flowers who said he told the sheriff that, but the sheriff denied knowing this. I don't remember what the sheriff's specific testimony – Because the way he committed the felonies, I thought he had a different name, so it may not have appeared in the background check. The question was whether Mr. Flowers personally told the sheriff. Flowers testified that he did, but the sheriff said he didn't. Am I correct about that? I don't recall the sheriff testifying that he didn't. I recall the sheriff testifying that Flowers was candid with him during the interview. I don't know that he spoke specifically about the past convictions. We know that the employee file has washed out any references to the other name, birth name, that Roger Flowers had. But Flowers' testimony alone – What do you mean had washed out? You're suggesting the impropriety by the sheriff? Oh, yes. I'm suggesting that he intentionally did a background check only under the name that he knew would not produce a reference to the felons that he had been convicted of. So you're saying the sheriff knew that Flowers had used a different name earlier on? Flowers was friends with the administrator, and Flowers testified that he was completely candid about the past history of criminal actions – Did the sheriff admit knowing the prior name? I beg your pardon? Did the sheriff admit knowing Flowers' prior name? I don't know if he admitted that, but Flowers' testimony alone construed in the light most favorable to the plaintiff means that the sheriff did know. The sheriff doesn't get out of the evidence from Flowers against the sheriff by simply denying. Right. So under the applicable standard, the sheriff knew that Flowers had a different name. He knew that he had a criminal background under that different name. And because of the friendship with Mike Sinnott, the longtime friendship between Mike Sinnott and Roger Flowers, they bypassed the rule that is meant to protect the people that are in the jail. You have people that are in jail, you want to protect them from a criminal element. It makes perfect sense. But it's more than a negligent standard. The sheriff has to actually, you know, under our case law infer that Mr. Flowers was going to commit a constitutional violation against the plaintiff. I don't think it has to be proven against the plaintiff, but it has to be proven that he was a risk for committing a sexual assault against someone in the jail, some woman in the jail. I think the standard is higher than a risk, isn't it? I beg your pardon? It's more than just a risk of a potential constitutional violation. To get past summary judgment, all we have to show is that there's at least circumstantial evidence that he knew there was a risk that this was when he ignored the risk, the deliberate indifference. And in this particular case, he ignored the criminal background. He didn't train Flowers. Flowers himself said that he was never trained. He didn't even know what the training materials looked like. He was never supervised. Does that make a difference? I mean, you know you're not supposed to have sex with an inmate. What sort of training do you need for that? Well, you could be trained. We know that Flowers was, in the words of Sheriff Christian, slow. If he had been trained that, you know, you need to follow these rules and here are the consequences and, you know, perhaps there was something in the training materials, presumptively, that would have convinced him it was wrong. But what we know here is that he wasn't trained. And the training's there for a reason. You can't just skip the training and say, I did no wrong. He skipped the training intentionally and he didn't supervise. In the Sheriff's own words, he's got 64 cameras in the jail. In his own words, he says, I tell them I look at the cameras, but I don't. He never reviewed the cameras. He failed entirely in the hiring, training and supervision of the employees. Is the supervisory claim still alive or did statute of limitations defeat that? I don't think we have a statute of limitations issue with the with the initial filing of the claim. I don't know that it certainly wasn't the basis for summary judgment. Our contention is, of course, that it is still alive at the time of filing. Is there anything on these old videos from the jail that would have alerted the sheriff that there was something bad happening? Absolutely. If he had been supervising, that's why it's so important that this happened for months. If he had been supervising, he would have seen the constant peep show. He would have seen the arrangement between two inmates to have a romantic visit in the hallway. If he had been looking at them, but he, by his own admission, says he wasn't looking at them. He says, I tell my people I'm looking, but I don't. So we have a deliberate indifference to following his own rules. He knows he needs to have hiring standards, training and supervision, but he doesn't do any of it. And he does it intentionally and he doesn't change his policy on hiring, training or supervision. Since then, yes, he got rid of the person before and flowers who were convicted of rape. But that doesn't mean he's changed his policy. And that's what I'm looking at. His policy is I wait until after something is reported to me. And that means if something's never even reported to him, he doesn't bother to investigate it. If you wait and litigate after the fact, you're missing the opportunity to do what the duty of the sheriff is in this case. And that's to prevent the harm from happening in the first place. I thought the sheriff is the one who discovered it. The sheriff claims to have been the one who discovered it. But Ms. Brown reported the rape just a day before to an outside nurse who then reported it to the sheriff. So while he does claim he discovered it, it's consistent with his wait until something is reported policy that Ms. Brown asked for a rape kit and asked to be taken to the hospital by a contract nurse, a third party not affiliated with the jail the day before he claims he discovered it. Is there a sworn statement from that contract nurse? No. The contract nurse was never found to get a deposition. Is there a name? There is a name, Jeff Black. We all agree who he was. And the other thing is that the note that was passed to him asking it was a handwritten request to be taken to the hospital that had to be shared with the sheriff has disappeared. Is it necessary to have a pattern of previous violations before the sheriff can be deemed to be deliberately indifferent in these circumstances? Not under TFOIA. He needs to know about past instances and know what the risk is. And that's why I compare this to TFOIA, because TFOIA is almost the identical set of fact pattern. You've got in TFOIA, actually, there were three prior instances, but they were in the very distant past. The prior instances we have are in the near past. In TFOIA, the sheriff actually tried to train his employees, but in this case, there was no training. In TFOIA, it just wasn't enough. He hired felons. He didn't supervise. TFOIA, in almost every respect, is like our case, but I think we, in all those different categories of facts, we exceed the wrongdoing on behalf of the sheriff in the TFOIA case. If there's nothing else, I'm out of time. Thank you. While you're coming up, G-I-R-O-N. In New Mexico, it's a Hispanic name pronounced G-I-R-O-N. Thank you. May it please the court. Wellen Poe on behalf of the appellee and defendant, Sheriff John Christian, in both his individual capacity and his official capacity. I'd like to split time if we have time. It depends on the questions because I know Mr. Senate's counsel would like to address those issues as well as the issue on punitive. The district court found on summary judgment, based on the evidence presented at summary judgment, that there was no deliberate indifference by the sheriff, neither his individual capacity on the supervisory claim, or on the policy, custom, and practice claim under the official capacity. Now, he looked at the evidence, not these assertions, not these kind of, let me throw everything against the wall and see what sticks, claims that we're getting from counsel, or from plaintiffs, in this action, in this brief that we've seen. I want to go through the facts that you asked counsel a couple things. For example, there is a claim, and he stood right here and said that the sheriff destroyed evidence, had a note and destroyed the note, destroyed personnel, file, information concerning the background check. There is not a shred of evidence of any of that. There is not a shred of evidence that the sheriff ever received a note. Actually, there's not any evidence that the note was ever received by Mr. Black, who was the nurse. But there certainly is no evidence, other than assertions without any support, that the sheriff ever received a note. What happened in this case is, on a Wednesday, after the second Sunday rape, or the sexual encounter, and at the time Mr. Flowers did and continues to say it wasn't rape, except statutorily, but was not forced, he said he has contended the entire time it was consensual. There was evidence it was forceful, though. There was evidence it was coerced. Yes, that's all we need for summary judgment. That is all you need. And of course, summary judgment was denied to Mr. Flowers. They have since gone to trial. When the accusations that Sheriff Christian didn't review video, there were 65 cameras in that jail, running 24 hours a day, 1,400 hours a day of video to look. Now, you can spot check some of that, but finding those back instances that have been alleged or alluded to, probably impossible unless you get a date from someone as to when that happened. What the sheriff does, and how he caught this case, is that he will go on live and watch different cameras in the jail. He'll go on to see what he watches, and he's caught staff doing things they shouldn't do, watching TV while not doing, or doing some of that. What happened in this case, and this is the only evidence there is, is that on a Wednesday morning, he is in his office, he pops up the cameras in the tower, and in the tower there were two cameras that pointed one down towards the screen and one kind of pointed to where the officer would sit watching the tower. He noticed that one of them was not in a placement where he knew it should be. It was pointed a little bit off of where he knew it should be. He calls the jail administrator and says, hey, something's wrong with the cameras. If someone has moved the cameras, come go find out what you did. What you can find out, come watch this. They find out, and through a quick investigation on that day, with the discussion of the jail administrator, they find out, they can see from the cameras, and you have the video in the record. It's hard to see, but they notice a girl or female in the tower. Immediately, the sheriff says, who is that? Go find her and see if we can talk about why she's there. From that comes the investigation, and quickly that same day, they interview Mr. Brown. He interviews Mr. Flowers. Mr. Brown tells him what happened. He says, here's what we did. Here's how I got there. He asks a few questions. He asks Flowers what happened, and he immediately arrests and terminates Roger Flowers. So he is reviewing, he's doing his job of looking at what's going on in this jail. As far as the supervisor role of investigation of Mr. Flowers on his hiring, there is testimony from the sheriff that he did not know the fake name, or the other name of Mr. Flowers until the deposition. Again, he may dispute it, but we're talking about summary judgment. Did Mr. Flowers testify that he told? Mr. Flowers testified he thought he told him. He also said that I was honest with him, but he didn't say to the extent of what he was honest about as far as protective orders in the prior criminal case. What the sheriff has testified to is that at the discussion, he thought Mr. Flowers was honest with him because Mr. Flowers admitted to a juvenile theft that was in his record and went through that. Wouldn't that have reflected the name he was using at the time? No, because he didn't tell him what the name was. He told him about the theft itself. He said, when I was young, parents left me, my sister and I took some checks, and we had a theft and I got arrested for that. That's what the crime was that the sheriff knew about. The sheriff ran the background check that he runs for every employee that gets hired. And on that, it did not show any protective orders. It did not show any criminal conduct. Now, we know now that the reason that didn't come up because there was a different name that Flowers had used at the time of the protective orders and the criminal conduct. Sheriff has testified clearly that he did not know that name until he was asked about it in his deposition. And you don't think the statement by Mr. Flowers is enough to overcome summary judgment? No, I don't think I may have told him it's sufficient. That's still speculation on Flowers as to what he's remembering. I don't know for sure if not. That's not enough to rebut a solid statement by the sheriff that says, I did not know and here's what I did. But throughout this has been… How does somebody get hired using an alias? I'm still confused by how that could happen. Well, part of that came from, and also, the other background check, part of the background check is Sheriff Christian actually called the prison where Mr. Flowers was working, used the name Roger Flowers. They said, yes, he's been working here for several months. We've not had any problems with him. We've not had anything of the sort. What's his real name? Flowers or something else? His known name now is Flowers. He went by a different name at the time because of, as I understand it, and I don't think it was ever clearly explained, but I understand it is because of stepfather's names and using that sometimes when he was living with stepfather and some of those… So he got arrested and prosecuted under a different name? Yes. That's why it didn't come up. Yes, and they were done as… The fact that we know that he knew about was done when he was a youth. But the training itself, it's clear Mr. Flowers knew at the time he got there he could not have sexual contact with an inmate. He admitted that he knew that. He says, I don't know if I remember when I was training, although he does state in some that there were four hours of training here, four hours of training there, there's evidence of the training that he attended in the record. But what he did say is that I knew even at the time I applied for a job at the jail, I could not have any type of similar encounter with an inmate. I knew that. I knew it was against policy. I knew it was illegal. The sexual conduct that plaintiffs wanted to use as far as giving notice to the sheriff that he might have problems is there was a three instance within about a day and a half time frame, about a year and a half before this, that both participants said was consensual. Based on that, it was done in an area where there might not have been enough camera coverage and the sheriff did at that time add 30 cameras to try and minimize those blind spots. That's clearly in the record. It's clearly in the evidence. So there were steps taken to take care of some of that and try and figure out how this can keep from happening sometime in the future. Plaintiffs rely on TIFOIA. TIFOIA doesn't apply in this case. The only similarities is that it's about a sexual assault in a jail. TIFOIA, for example, four cameras in the whole jail. At the time of Mr. Flowers' incident, there were 60 and that had grown from 30. So it's taken actions. The court in the TIFOIA found that the jail was a place of persuasive delinquency. Pervasive. Pervasive, thank you. Pervasive delinquency. In this case, we had the one instance before which, after the fact, the sheriff took action and then we have the two instances of Mr. Flowers. And in the briefing, it's a continuous argument that there were five instances before Mr. Flowers' incident. There are three instances of the same male and female inmate, consensual, as both testified to in the criminal cases. And then the two instances of Mr. Flowers. That's the only instances of any sexual contact that had happened in jail since the sheriff has been there 20 years. TIFOIA also, the court was very critical that there was no discipline of any officers for such action. In our case, not only was there termination, there was arrest and prosecution of both the prior case and the case involving Mr. Flowers. In TIFOIA, the court found that the female contact with male staffers was a common occurrence. In this case, in Pontefract County Jail, it was not a common occurrence. Staff knew that they should not be alone with other females, absent some emergency, if they had to be in contact with them. Flowers is the only one that had that contact. And he did that by asking Ms. Brown to go through three locked doors, go down a hallway, hide in the hallway when Flowers realized that the shift supervisor was walking down the hallway, hide behind a door, and then come on up. So it wasn't just as simple as being in an area where they were together. He asked her, she voluntarily came up through those three locked doors and then returned the same way both days. TIFOIA, the sheriff would make comments and make comments to people, I'll back you up no matter what you do in this jail. That's not the instance here with Sheriff Christian. He says, I will fire you when he hires you, I'll fire you, I'll arrest you, I'll prosecute you. Do you want to leave time for your colleague? We believe that the court was proper, and we would ask that the summary judgment be sustained. I would like to make one correction to the brief quickly. On page 38 of Sheriff's brief, in the last sentence before Barney v. Pulsifer citation, the last clause says, does amount to a constitutional violation, the word not is missing and should have been put in there. Again, that's on page 38, the last clause before the citation to Barney. Thank you. May it please the court, Mark McAllister on behalf of the appellee, Mr. Sennett, who was acting as the jail administrator at the time these acts took place. Just very briefly, the claims that relate to Mr. Sennett that have been prosecuted on appeal by the appellant relate to claims that Mr. Sennett engaged in retaliatory conduct against the appellant as a result of her reporting the sexual relationship that she had with the jailer. And I think the record's clear, and the evidence of the case that has been put forth in the briefs that is what was considered at the trial court level was the summary judgment briefs, is that Mr. Sennett did not engage in any type of retaliatory conduct toward the appellant as a result of her alleged reporting of the sexual relationship. I think it's important to go back and look. This is kind of a straw man argument that's been set up because as mentioned by counsel for the sheriff, this act was discovered by the sheriff and Mr. Sennett. What happens is the sheriff notices this camera in the control tower is out of place. He contacts Mr. Sennett. He comes up and he asks him to basically kind of a reflection in the glass. He can see this mirror is pointed toward the ceiling instead of where it should be pointing, showing what the guard is doing. They're able to determine by asking Mr. Sennett, because he's familiar with the prisoners, who this individual is. Mr. Sennett identifies her, and that's why she is brought in to be questioned about what happened. You'll see on the video that's part of the record, Mr. Sennett tells the appellant when she's brought in, before the sheriff comes in, he tells her, you're not the one that's in trouble. We just want to know what happened. We want to know the truth. There's never any threats or coercion against her or indication that he's going to punish her if she tells what's happened because they've essentially at that point, you can put two and two together. You have a guard in a guard tower moving cameras, having a female inmate brought up there. It's pretty clear. They're just trying to figure out exactly and get evidence of what happened. Once they get that evidence, then as the record's clear, they terminate and arrest the jailer at that point, Mr. Flower. Where we're at as it relates to Mr. Sennett is that there's a claim that he somehow forced the plaintiff to take a plea agreement that she didn't want to take and that that violated her constitutional rights. The record's clear that that's not what occurred. The appellant was represented by counsel when she did this plea negotiation with the district attorney's office. The claim is they forced her to, my client, the appellee, Mr. Sennett, basically forced the appellant to take this plea agreement in an effort to get her out of the jail and punish her for reporting this crime. But if you look at the undisputed facts that were set forth in the briefs and presented to the court, the district attorney's office said no one from the jail influenced his decision on what type of plea agreement or plea offer he made to her. Let me ask about a couple of retaliatory, alleged retaliatory acts. We're not addressing these. What about the blaring the music so that she couldn't sleep? Was that just against her or were all the people jailed subjected to that? What the plaintiff has alleged, I'm sorry, the appellant has alleged, Your Honor, is that there was music played over an intercom system when she was placed in the isolation unit due to her being involved in altercations with other prisoners. And so what she's alleged is there was music played at night, I guess, to keep her awake and deprive her of sleep. But the undisputed evidence in the case is that Mr. Sennett, who allegedly did this, worked from 9 to 5. So if he's pumping this music in at night to keep her awake, it's kind of hard to do when he's not at the jail doing this, doing his job or working. So there's no evidence that this actually took place other than the plaintiff saying someone played this music through an intercom into my cell and deprived me of my sleep. And if you look at the case we cited and the— You're setting up on that point. Sure. What about denying the rape kit, telling her she's pregnant? Again, the rape kit, Your Honor, there's no evidence that that was ever actually requested. She said it was, didn't she? She claims that she passed a note to a non-employee, but there's no evidence that that note actually existed. There's been no testimony from that non-employee nurse that they received this note or that there was ever any request of a rape kit or a denial of a rape kit. So there's no evidence of that. Telling her she was pregnant. That, again, Your Honor, that just goes to what the plaintiff has alleged. It would be our position that even if, based on what she says in her testimony, is that there was a statement made, which has been denied by both Mr. Sinnott and the other worker, that she had taken a pregnancy test and it came back positive. And what she testified to is they told her this and then a few minutes later told her, no, we're just joking. So even assuming that happened, that doesn't rise to the level of a constitutional violation. At worst, it's bad practice, it's unprofessional, but it doesn't result in a constitutional violation that caused damages that rise to the level that she could seek recovery under a 1983 action for assuming her allegations to be true, a very poor joke and very poor taste for five minutes. Can we hear a little bit about punitive damages? Thank you, Your Honor. Thank you, Your Honor. May it please the court. I guess I'll get my two cents in. In one minute, two cents or one minute. One minute. In the interest of time, I'll primarily respond to what Counsel for Brown argued. I don't have much more to offer other than what was in the brief, but I will say that it overlaps with what we recently heard, which is that there is this pattern of conflating standards here, where in her own there's discussion about no legitimate penological purpose for sexual activity between a jailer and an inmate, that's true. However, that's in the context of the standard with respect to liability. But if there's deliberate indifference, wouldn't that be enough for punitive damages? For deliberate indifference, yes. That would be the standard for punitive damages does include callous indifference. It includes evil intent. However, in this instance, what the court was dealing with is a situation where there's no evidence that Mr. Flowers knew that he was forcing her to do anything. So with respect to Jerome, where can you presume malice? That's why it satisfies the objective element. She didn't testify that he coerced her. She later did. However, what the court also did— Later did before trial? In her deposition testimony, she did. However, she was asked about this on two prior occasions. She was asked about it in the interview immediately after the fact by the sheriff. What happened? She said we had sex. There was no report of any kind of coercion. She testified, and Mr. Flowers— But can we ignore her testimony that she was coerced? Did that come out at trial? Well, the appellate record is limited to the summary judgment. At trial— You're right. And no, Your Honor, I'm not proposing that we ignore testimony. However, what I'm saying is that Judge White was correct in assessing and applying two separate sets of standards, where there's one standard for liability and one standard for punitive damages. But being coerced would justify punitive damages, wouldn't it? Potentially. So how do we ignore that testimony? Under what doctrine do we say we ignore this testimony because she had said something else to the contrary before that? Well, I think Judge White looked at the totality of the evidence and concluded that there was just no reasonable or genuine dispute with respect to Mr. Flowers' state of mind at the time. Because, as we know from Kingsley, for liability, what Mr. Flowers was thinking doesn't matter. For liability, when determining whether Brown satisfies the objective prong of the test, we look at her and say that this is presumed to be malicious so that she doesn't have to prove much more than that. And then we raise the consent defense. And at that point, we look at Ms. Brown's state of mind. However, for punitive damages, that focuses more on what Mr. Flowers was thinking at that time. And if you look at all of the evidence, you can see that there's no dispute that Mr. Flowers didn't think he was forcing her. However, when you compare everything else, because what you have is you have surveillance video where you can see what Ms. Brown is doing to a limited extent. You can see that she's lifting her shirt. You can see that there's some kind of— She tells her to turn around and she starts crying, and that's not— That's her testimony. And she has testimony at a deposition setting. However, right after the fact, she's interviewed. Then she testified in Mr. Flowers' criminal proceedings. You've got good jury arguments, but I'm having trouble with summary judgment. Well, I think that in this particular case, it is a difficult case because you have liability that was denied and it went to a trial. And then you have punitive damages where it's a different standard, but it's not as high or it's a negligence standard. So what Judge White concluded was that the undisputed fact showed negligence or a carelessness with respect to her constitutional rights. And so that was based on the record evidence at the time it was submitted in March 2019. And so you can apply these two separate standards and reach different results. And so there's no conflation of these standards where the mere instance of sexual activity between a jailer and an inmate carries with it the assumption of malice. Punitive damages also looks at what Mr. Flowers is thinking. And in that respect, there's no dispute about what he was thinking. The only contrary testimony that, well, there was coercion. Well, there was a tribal issue of fact on coercion. Thank you. Thank you. Unless there are other questions. Thank you. How much time do we have left? Oh, he's over. I was over, Your Honor, but in light of the extra argument for them, if I may be permitted just two minutes to address a few facts briefly. Thirty seconds. I don't think you need much time. I think the persistent problem here is the failure to accept the standard of review that requires the facts to be construed in favor of the plaintiff. You hear counsel for Mr. Flowers say he never or that Brittany Brown testified that she wasn't coerced. That's not true. The time that he's referring to was in a preliminary hearing where she was never even asked if she was coerced, if it was forceful. Every time she testified, she said she was forced. It was forceful. It was aggressive. She didn't want it. She cried. When counsel for Sheriff Christian says there's no evidence of these things, what we do know is that there's evidence that there was video that was destroyed, video of the peep show. There was the note that was destroyed. There was a phone call. Plaintiff was on a recorded line talking to her mother, explaining the fact that she'd been raped, and that was destroyed. We have not just the failure to follow the policies, but we have actual cover-up after it's discovered through the passage of the note to the nurse that is supported by the evidence and is. We know that the videos and the recordings were available, but were not preserved. Lastly, on the issue of the retaliation, the court never reached the issue of all the different elements of retaliation. You'd have to presume those in favor of the plaintiff because of the evidence from the plaintiff, but the court never reached those because of the misapplication of the Heck v. Humphreys case. The court said as a matter of law she had to follow the habeas statute, and that's not correct. The Supreme Court has spoken on that. So we have a misapplication of law that prevented the trial court from ever even getting to a full analysis of the issues on the retaliation. And if we did get to the issues on retaliation, remember that the sheriff himself said he didn't admit those retaliatory efforts took place, but he did admit if they did, which you would presume on summary judgment, they were wrongful. So plaintiff supports the fact that they happened. The sheriff supports the fact that they would be wrongful if they did happen. If we get past Heck v. Humphreys, the retaliation claim is made. Thank you, counsel. Case is submitted. Counselor excused.